UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 08-45257** |
| PETTERS COMPANY, INC., et al, | Court File No. 08-45257 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (GFK) |
| PC Funding, LLC; | 08-45326 (GFK) |
| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc. | 08-45329 (GFK) |
| Edge One LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### ORDER OVERRULING OBJECTION OF
### RITCHIE SPECIAL CREDIT INVESTMENTS, LTD., ET AL,
### TO APPOINTMENT OF TRUSTEE IN CHAPTER 11 CASES,
### AND APPROVING APPOINTMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

At St. Paul, Minnesota, this 26th day of February, 2009.

These jointly-administered Chapter 11 cases came on before the Court on January 27, 2009, for hearing on an objection to the United States Trustee's appointment of Douglas A. Kelley, Esq., as Trustee for all of the Debtors in these cases. The objectors, Ritchie Special Credit Investments, Ltd. and other creditor-parties related to it (collectively, "the Ritchie Parties") appeared by their attorneys, James M. Jorissen, Leonard, O'Brien, Spencer, Gale & Sayre, Ltd., Minneapolis, and Bryan Krakauer, Sidley Austin LLP, Chicago. The United States Trustee appeared by his attorneys, Michael E. Ridgway and Robert B. Raschke. The Unsecured



**EXHIBIT**

1

G. 08-364

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on **02/26/2009**
Lori Vosejpka, Clerk, By jrb, Deputy Clerk

SCANNED   SEP 2 9 2010

Creditors' Committee for these cases ("the Petters Committee") appeared by its attorney, David E. Runck, Fafinski Mark & Johnson, P.A., Eden Prairie. Douglas A. Kelley, the Trustee-appointee, appeared personally and by James A. Lodoen and George H. Singer, Lindquist & Vennum, P.L.L.P., Minneapolis. Ronald R. Peterson, Esq., Chicago, trustee for the bankruptcy estates of Lancelot Investors Fund, L.P., et al, participated in the hearing in that capacity. Dennis M. Ryan, Faegre & Benson, Minneapolis, and Richard A. Chesley, Paul, Hastings, Janofsky & Walker LLP, Chicago, appeared as prospective counsel for the Unsecured Creditors' Committee in *In re Polaroid Corporation, et al.*, BKY 08-46617 ("the Polaroid Committee"). The following order is based on the record made for the hearing.

### INTRODUCTION

These Chapter 11 cases were commenced by voluntary petitions filed during October, 2008. Petters Company, Inc. ("PCI") and Petters Group Worldwide, LLC ("PGW") are the debtors in the two lead cases of the group. PCI and PGW were established by one Thomas J. Petters in 1987-1988, as "holding companies" for other entities through which he was to own and conduct various business enterprises and transactions. In his individual capacity, Petters is the sole shareholder of both PCI and PGW.[1] Except for Palm Beach Finance Holdings, Inc., all of the other debtors in this group of cases are subsidiaries of PCI, i.e., business entities as to which PCI is the shareholder or equity holder. Tom Petters is the sole shareholder in Palm Beach Finance Holdings, Inc.

Polaroid Corporation, a subsidiary of PGW, has been in Chapter 11 in this Court since mid-December, 2008. Its case is being jointly administered with those of nine other business

---

[1]For over a decade, Petters has been known in regional media by his nickname; hence, "Tom Petters" will be used for all further references to him as an individual.

entities related to it, in a case-grouping separate from the one at bar.[2] A number of other entity-subsidiaries of PCI or PGW are not in bankruptcy at this time.

When the PCI/PGW cases were commenced, Tom Petters was not the individual who authorized the filings. Nor did he sign the petitions to commence the cases. At that time, Tom Petters lacked the legal authority to do these acts; and, in a way, he was hampered physically from signing. Tom Petters was in the custody of the United States, incarcerated and charged with several felony offenses including mail and wire fraud. His personal assets and the bulk of his business enterprises were under the control of a receiver appointed by the United States District Court for this District. Under express authorization from the District Court, the Receiver, Douglas A. Kelley, Esq., signed the bankruptcy petitions and put the Debtors into bankruptcy. Tom Petters has had no involvement with these cases since their commencement. All decision-making and action on behalf of the bankruptcy estates has been considered, undertaken, and effected by Kelley, with the advice and representation of bankruptcy counsel.

On motion of the United States Trustee, this Court directed the U.S. Trustee to appoint a trustee or trustees for these cases, pursuant to 11 U.S.C. § 1104(a).[3] On December 24, 2008, the U.S. Trustee appointed Kelley as trustee for all of the cases, and applied for an order

---

[2]MN Airlines, LLC, d/b/a Sun Country Airlines, is a business entity as to which Tom Petters was the controlling individual principal through two holding companies. Sun Country Airlines and its holding companies are also in Chapter 11 in this Court. That jointly-administered grouping is assigned to Judge Robert J. Kressel. The background and status of the Sun Country Airlines cases are not relevant to the matter at bar.

[3]The U.S. Trustee had made the motion after counsel in his office concluded that these corporate debtors had no individual officers legally chargeable as stewards of the bankruptcy estate and subject to the fiduciary obligations mandated by statute, after the cases were commenced. The unseating of Tom Petters from control and the bar on appointment of other individuals who had made up the pre-petition management of these debtors had left them without anyone exercising day-to-day and strategic administration, with the continuity inherent in the statutory concept of a debtor-in-possession, 11 U.S.C. § 1101(1). The U.S. Trustee also concluded that bankruptcy law would not countenance a continuing status of managerial custodianship for Kelley in his role as a court-appointed receiver. The legal bases for his conclusion were the bar on appointment of a receiver within a bankruptcy case, 11 U.S.C. § 105(b), and the obligation of any custodian to turn over property of the estate to the trustee in bankruptcy, 11 U.S.C. § 543(b)(1)--the statutory definition of "custodian" including a receiver appointed pre-petition, 11 U.S.C. § 101(11).

approving the appointment pursuant to FED. R. BANKR. P. 2007.1(c).[4]

  The Ritchie Parties timely filed an objection[5] to the U.S. Trustee's appointment.

  The U.S. Trustee's appointment, and the Ritchie Parties' objection, are the matter at bar. The theory of the objection is summarized by the very first sentence of the Ritchie Parties' written submission: "Inherent, intractable and immediate conflicts of interest preclude Kelley from serving as Trustee for all the Debtors [in these jointly-administered cases]."

## FURTHER BACKGROUND[6]

### The Relevant Civil and Criminal Proceedings

  These bankruptcy cases are the product of a swirl of events that began on Wednesday, September 24, 2008. On that date, agents of the Federal Bureau of Investigation, the Criminal Investigation Division of the Internal Revenue Service, and the United States Postal Inspection Service executed a search warrant at the Minnetonka, Minnesota headquarters of Tom

---

[4]The text of this rule taken into account for this decision is the amended version that was effective December 1, 2008.

[5]In an order entered on December 17, 2008, the Court had set deadlines for various stages of the appointment process.

[6]As a technical matter, the recitations in the following section are findings of fact. Most of them merely identify the progression of various proceedings in courts, state and federal, in which Tom Petters, the debtors in these and other bankruptcy cases, certain creditors, and the United States of America were parties. As such, these recitations are not subject to dispute. The remaining recitations go to out-of-court events and the out-of-court acts of relevant persons or entities. They are based on verified statements in the record. The content of these recitations has been deliberately limited in topic and scope. At a hearing on January 22, 2009, the Court ordered that in-court testimony would not be taken for the objection at bar, and denied the Ritchie Parties' late-coming motion to conduct an expedited discovery process into a very broad array of subject matter. This disposition was based on a ruling that the Ritchie Parties' objection was to be treated as a matter of law, with the focus on three things: Kelley's specific charge under the District Court's orders governing his status as Receiver; the change of that status with the advent of bankruptcy for some of the entities previously under the receivership; and any resultant effect on Kelley's own definition of his prospective role as trustee. None of those considerations entail historical fact, per se. Thus, the recitation of events extraneous to the courts' records has been limited to those that the District Court clearly relied on when it appointed Kelley as Receiver, and vested him with broadly-described powers to take control over assets that had some arguable connection with the newly-commenced criminal cases against Tom Petters and others. This is also done with due regard for the Ritchie Parties. One can safely assume that they will maintain their position that this controversy is intensely fact-bound, in a very personalized way. Restraint in the scope of background fact-finding will avoid materially contradicting the Court's rejection of that position.

Petters's business entities. They seized and removed records of the Debtors, Tom Petters, and other individuals.

Within a day after the execution of the search warrant, a criminal defense attorney retained by Tom Petters asked Douglas A. Kelley, Esq., to represent the various entities of Tom Petters's business enterprise.[7] Two days after that, Kelley was contacted by an Assistant United States Attorney for the District of Minnesota. On behalf of the Department of Justice, the AUSA wanted to discuss Kelley's prospective role as counsel for the Petters entities and the intentions of the United States toward the assets and operations of Petters's business enterprises.

In the wake of that conversation, the U. S. Attorney did not take action on behalf of the United States to seize the assets of Petters or the Petters businesses under color of civil or criminal forfeiture. This meant that Sun Country Airlines and Polaroid Corporation were able to continue their business operations in the marketplace.

On Kelley's advisory in relation to the government's forbearance, Tom Petters resigned his offices and positions with PCI, PGW, and all related entities on Monday, September 29, 2008. He physically vacated his office at the corporate headquarters on that date.

During the following several days, Kelley conducted a factual investigation of the surroundings into which he had placed himself. He started the task of determining the scope of the assets and operations of the Petters business entities; he interviewed various of their employees; he interviewed potential counsel to assist him; and he fielded inquiries from creditors and other persons. He also had numerous and frequent contacts with employees of the office of the United States Attorney, discussing options to preserve the values of the Petters enterprises for the benefit of those who would be entitled to that value.

---

[7]Previously, PGW had had in-house counsel and the various Petters business entities had been represented by an outside law firm. All of those attorneys resigned and withdrew after the execution of the search warrant.

During this week, the office of the United States Attorney took no action toward a government seizure of any part of the Petters enterprise.

In the meantime, the Ritchie Parties had commenced a civil action in the Circuit Court of Cook County, Illinois, by a filing made on September 29, 2008. The Ritchie Parties are a Chicago-based group of hedge funds and other investment vehicles. In their lawsuit, they asserted rights to payment under a series of promissory notes executed by Tom Petters and PGW or PCI. They also claimed to have been defrauded by the makers of the notes. The Ritchie Parties obtained an *ex parte* temporary restraining order from that court against Tom Petters, PCI, and PGW. That order restricted the disposition of those parties' assets other than transfers made in the ordinary course of business.

Kelley learned of the Ritchie Parties' lawsuit during the week of September 29. On Thursday, October 2, 2008, he advised the United States Attorney's office of it. The United States Attorney then filed a complaint in the United States District Court for this District, under the caption *United States of America v. Thomas Joseph Petters, et al.* In it, the government sought various forms of legal relief toward the containment and assemblage of the assets of Tom Petters and the entities in his business enterprise, and protection against the further use of those assets in connection with an "elaborate scheme to defraud individual and group investors." The government also sought to prevent the dissipation of assets or their value by Tom Petters or anyone in consort with him. The government "estimated that the Defendants [had] to date profited in excess of $3 billion from their illegal activities."

The named defendants in this proceeding were Tom Petters, PCI, PGW, and other individual persons alleged to have participated in a pattern of fraudulent activity ultimately attributed to Tom Petters. The remedies invoked in the complaint were equitable in nature: interim injunctive relief to prevent the defendants or those in consort with them from taking any further action affecting the assets, and an accounting for the whereabouts of liquid assets. The government also prayed

6

for "such other additional relief as the Court determines to be just and proper." In an early-filed first amended version of the complaint, this catch-all request specifically included "the appointment of Receivers."

This civil action was given file no. 08-cv-05348. It was assigned to Judge Ann D. Montgomery of the United States District Court. On Friday, October 3, 2008, Judge Montgomery granted an *ex parte* temporary restraining order, essentially freezing all of the assets of PCI, PGW, and all related entities owned or controlled by them.

On that same day, October 3, 2008, Tom Petters was arrested on federal charges of mail and wire fraud, money laundering, and conspiracy. He remains in federal custody to date. He is now under indictment for those offenses, a federal grand jury having returned such in 20 counts on December 1, 2008.

Meanwhile, in their civil action in Cook County, Illinois, the Ritchie Parties filed an *ex parte* request for the appointment of a receiver over PCI and PGW on Friday, October 3. Asserting that their collateral would be in jeopardy otherwise, they cited the pendency of the criminal proceedings, the resignation of the companies' management, and an indeterminacy of Kelley's legal authority. Kelley and the United States Attorney learned of this request during the weekend of October 4-5.

On October 6, 2008, the Illinois court entered an order appointing one William "Billy" Procida as Receiver for both PCI and PGW. The order gave Procida "the authority to take possession of the Collateral." As a term, "the Collateral" was not otherwise defined in the text of the order. Apparently, it referred to all assets of PCI and PGW in which the Ritchie Parties asserted security interests or liens. Beyond that, however, the order granted Procida "all of the usual powers of a receiver, including without limitation, management and operation of [PCI and PGW], collections of receivables, rents, and other Collateral." It gave him other broad powers, including the ability to "hire and fire employees and make all other necessary employment decisions" and to make

7

"payment of . . . necessary expenses, including reasonable compensation for himself," without the obligation "to apply to the Court for approval of such fees."

The United States Attorney's office then took action in the civil proceeding in the United States District Court here, to request the appointment of a receiver under federal law, 18 U.S.C. § 1345(a)(2)(B)(i) - (ii).[8]  Kelley's name was among those submitted to Judge Montgomery for her consideration in the appointment.

On October 6, 2008, Judge Montgomery entered an order appointing Kelley as Receiver of PCI, PGW, "and any affiliates, subsidiaries, divisions, successors, or assigns owned 100%" by PCI or PGW.  The United States and Tom Petters had stipulated in writing to the entry of this order.  In a later order, entered on October 14, 2008, she appointed Kelley as Receiver for all but one of the remaining individual defendants being prosecuted in conjunction with the criminal case against Tom Petters.[9]

Pursuant to authority granted in the District Court's orders, Kelley then hired counsel to represent him for all legal matters entailed by his status as receiver.  Later he hired other

---

[8]In pertinent part, these subsections authorize legal actions as follows:

. . .

(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in [18 U.S.C. § 3322(d)] . . ., the Attorney General may commence a civil action in any Federal court--

. . .

(B) for a restraining order to--

(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

(ii) appoint a temporary receiver to administer such restraining order.

[9]Another person was appointed as receiver for that defendant, Frank E. Vennes, Jr.

professionals, including a team of forensic accountants whom he tasked with reconstructing and tracing the flow of funds and assets through the various entities in Tom Petters's business enterprise.

On October 10, 2008, the Illinois state judge presiding over the Ritchie Parties' lawsuit determined that his court's orders for a freeze of PCI's and PGW's assets and appointing Procida as receiver had "expired and [were] of no present effect." Essentially, the Illinois judge deferred to the United States District Court's appointment of Kelley. Expressly relegating the Ritchie Parties to "their rights on appeal or otherwise with respect to the Minnesota District Court's order," he deferred further consideration of the proceeding before him to mid-April, 2009.

## KELLEY'S RECEIVERSHIP: THE SPECIFICS

Four different forms of order providing for the appointment of Kelley as Receiver have been entered in file no. 08-cv–05348.

The first, entered on October 6, 2008 as previously noted, named Kelley as Receiver for PCI, PGW, "and any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by" those two entities.[10] This order authorized him to take certain specific actions in relation to PCI, PGW, and the other entities under his receivership; it amounted to a grant of near-plenary power to amass their assets and to control them while he continued to hold them. In specific, he was empowered to:

> [c]onserve, hold, and manage all receivership assets, and perform all acts necessary or advisable to preserve the value of those assets in order *to prevent any irreparable loss, damage, or injury to consumers or creditors of the Entities* [under the receivership], including but not limited to obtaining an accounting of the assets [and] preventing transfer, withdrawal, or misapplication of assets and including . . . filing any bankruptcy petitions for any of the Entities [under the receivership] to protect and preserve the assets of any of [them] and acting as management or Debtor in Possession of any of

---

[10]The scope of the receivership expressly excluded "Thomas Petters, Inc., and its subsidiaries including but not limited to: MN Airlines, LLC, dba Sun Country Airlines."

the Entities so filed by the Receiver . . ."

(emphasis added).

The second, entered on October 14, 2008, made Kelley the Receiver of the assets

and business operations of Tom Petters individually, and of other individuals who were named

defendants.[11]

The third, entered on October 22, 2008, amended the terms of the two earlier orders

via a partial reorganization and reformatting of the provisions for Kelley's authority. Its one major

addition was the creation of a "Stay of Actions against Receivership Defendants," in the form of an

injunction against any judicial or extra-judicial "action that would interfere with the exclusive

jurisdiction of [the District] Court over the assets or documents of the Receivership Defendants."

The fourth version, the one currently effective, was docketed on December 8, 2008.

It was entered on Kelley's motion and over the objection of certain creditors of PCI, PGW, or their

affiliates. In pertinent part, it provides first that Kelley is:

> . . . appointed Receiver for [Tom Petters, PCI, PGW, and the other
> individual defendants] with the full power of an equity Receiver. The
> Receiver shall be solely the agent of this Court in acting as Receiver
> under this Order and shall have judicial immunity. The Receiver
> shall be accountable directly to this Court and shall comply with any
> local rules of this Court governing receivers, as well as the Federal
> Rules of Civil Procedure. He is appointed Receiver for [Tom Petters,
> PCI, PGW, and the other individual defendants] until such time as
> real or perceived conflicts arise, at which time he will consult the
> Court to determine how to proceed.

It then gives him "all necessary powers to accomplish the following":

> 1.      Take exclusive immediate custody, control, and possession
> of all the property, assets, and estates belonging to or in the
> possession, custody, or under the control of [Tom Petters,
> PCI, PGW, and other individual and corporate defendants],
> wherever situated, except those assets seized by the United
> States pursuant to valid orders of a court. The Receiver shall

---

[11]Both of these orders were entered after the entry of stipulations between the United States and
various named defendants.

have full power to divert mail and to sue for, collect, receive, take in possession, hold, liquidate or sell and manage all assets of [Tom Petters, PCI, PGW, and the other defendants] and other persons or entities whose interests are now held by or under the direction, possession, custody, or control of [Tom Petters, PCI, PGW, and the other defendants];

2.   The Receiver shall also assume control over all ongoing business operations in which [PCI, PGW, and the other defendants] have a controlling interest. With regard to these business operations, the Receiver shall:

. . .

c.   Manage, administer, and conduct the operations of the ongoing legitimate business operations of [Tom Petters, PCI, PGW, and the other defendants], until further Order of this Court, by performing all incidental acts that the Receiver deems to be advisable or necessary; including but not limited to filing any bankruptcy petitions for any of the [Petters business] entities to protect and preserve the assets of any of the entities. Any bankruptcy cases so commenced by the Receiver shall during their pendency be governed by and administered pursuant to the requirements of the United States Bankruptcy Code, 11 U.S.C. section 101 *et seq.*, and the applicable Federal Rules of Bankruptcy Procedure. Notwithstanding the foregoing, any claims arising under federal laws relating to forfeiture and restitution (1) against or to recover assets of the bankruptcy estates of such bankruptcy cases, or (2) for distribution from such bankruptcy cases, are preserved and not affected in any way by this paragraph.[12]

. . .

6.   *Coordinate with representatives of the United States Attorney's office and Court personnel as needed to ensure that any assets subject to the terms of this Order are*

---

[12]This paragraph basically supplanted Terms IV.B.4. and IV.B.5. of the October 6, 2008 order. As quoted earlier, the October 6 order did contain an authorization for Kelley to file bankruptcy petitions, plus an authorization to "act[ ] as management or Debtor in Possession of any of the Entities so filed . . .," at Term IV.B.4.

> available for criminal restitution, forfeiture, or other legal
> remedies in proceedings commenced by or on behalf of the
> United States;[13] . . .

## THE BANKRUPTCY CASES: COMMENCEMENT AND CONDUCT

Under the authorization of Term IV.B.4. of the October 6, 2008 order, Kelley had his attorneys prepare petitions for bankruptcy relief under Chapter 11 for PCI, PGW, and several of PCI's subsidiaries. He signed the petitions in his status as Receiver. They were filed, variously, on October 11 (Petters Company, Inc. and Petters Group Worldwide, LLC); October 15 (PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc.; Edge One LLC; and MGC Finance, Inc.); and October 17, 2008 (PAC Funding, LLC). The petition for Palm Beach Finance Holdings, Inc., a corporation owned directly by Tom Petters as sole shareholder, was filed on October 19, 2008.

After these cases were commenced, Kelley exercised authority over the ongoing business operations of PCI, PGW, and the other Debtors. He worked with the bankruptcy counsel whose employment for the Debtors had been court-approved, to meet the various filing and compliance duties of a debtor-in-possession under statute, rule, and United States Trustee prescription. With bankruptcy counsel, he brought and prosecuted various motion proceedings in these cases. For all this, he asserted the authority to "act[ ] as management or Debtor-in-Possession of any of the Entities so filed [into bankruptcy] by the Receiver," under the District Court's orders of October 6 and 22, 2008.

Early in these cases, however, attorneys for the United States Trustee raised the substantive concerns identified in n.3, *supra*--i.e., whether bankruptcy law countenanced Kelley acting in the capacity of a debtor-in-possession in Chapter 11 cases under color of the District

---

[13]The emphasis here is added for the purposes of the present decision. It is imposed only to highlight the major item of contention that the Ritchie Parties gleaned from the attributes of Kelley's receivership. This paragraph did not have an analogue in the October 6, 2008 order.

Court's order alone, given that the Debtors had no continuing management personnel independent

of the bankruptcy process. The issue was made more pointed by the District Court's express

contemplation that the substantive law of the Bankruptcy Code would govern the cases of any of

the Petters business entities. The issue, abstruse as it was, was novel; it was not significantly

explored in published case law, and apparently there was no published decision that was on all

fours factually and procedurally. The issue implicated the authority of two different federal forum

courts, and it seemed to require the harmonization of alternate schemes of legal governance.

Ultimately, the United States Trustee forced the issue by filing his motion for

appointment of trustee on December 2, 2008. After evaluating the very unsettled nature of the legal

issues, and in light of the need to conserve resources to address the massive substantive

complications of all of the Petters-related cases in all courts, Kelley did not oppose the U.S.

Trustee's motion.[14]   The U.S. Trustee appointed Kelley when he was directed to exercise his

appointment authority; and in turn, the Ritchie Parties objected to the appointment, reprising the

demands they made in response to the U.S. Trustee's initial motion. By the time the objection got

to a hearing, the Petters Committee and the Polaroid Committee had aligned with the U.S. Trustee,

in opposition to the Ritchie Parties. For the hearing, Kelley presented a recap of case history that,

he submitted, showed the objection to lack foundation.

In the meantime, and in an unbroken line since the commencement of these cases,

Kelley has acted, de facto, as if he were a managing officer of these Debtors for the purposes of

all their post-petition activity, related to the Chapter 11 process or not. There was no one else to

do these things. There is no indication in the record for this motion that Kelley has ever taken any

action that was self-interested, contrary to the interests of the bankruptcy estates, or in any way

---

[14]The Ritchie Parties injected themselves into this initial motion proceeding, by insisting that the
Court act at that time to order the U.S. Trustee to appoint a person as trustee for PGW who would be
different from anyone appointed as trustee for any of the other Debtors. The Court ruled that such a
request would not be ripe until the U.S. Trustee had exercised his authority to appoint a trustee *or trustees*
for the several cases, and denied it without prejudice.

inconsistent with the obligations of a fiduciary steward of the estates.

## DISCUSSION[15]

### I. Introduction

#### A. The Ritchie Parties' Perceived Stakes, and Their Motives as Objectors

Before launching into the analysis, it is important to note one thing:  the Ritchie Parties do not come forward as neutral, distanced friends of the abstract value of integrity in the administration of bankruptcy estates, as their rhetorical rectitude would suggest.  Rather, they project a powerful self-interest onto the strategic plane.  Identifying the elements of their self-interest does much to illuminate the predicates of their objection.

For the great majority of their claim, the Ritchie Parties assert the status of contractual creditors to which PGW alone was indebted.  As such, they maintain, they are entitled to a pro rata share of the estate of that Debtor alone.  More specifically, they insist that they must not be forced to share with claimants that had been in contractual privity with PCI or its subsidiaries--whether that sharing were to be forced via substantive consolidation of the bankruptcy estates or by other means.

This could be a matter of some magnitude.  PGW apparently was Tom Petters's holding company for subsidiaries that maintained ongoing operating businesses.  At least some of those operating businesses had substantial assets of real value when PGW was put into bankruptcy.  On the other hand, PCI has been portrayed as his holding company for "single purpose entities," corporations formed to handle one-time acquisitions of large lots of high-ticket consumer merchandise or other goods, each one procuring the attendant financing in its own right. At least from Kelley's early investigation, it appears that many of these one-shot companies had neither goods nor money when these bankruptcy cases were commenced, their business deals

---

[15]In the main, the recitations in this section are conclusions of law.  Here and there they will include an additional finding of fact, going to very specific aspects of the procedural backdrop.

unconsummated. The suspicion is that the enabling funds were spirited away into other sectors of Tom Petters's business structure.[16]

One really cannot gainsay the Ritchie Parties for their objection; their exposure is large, rendering high the stakes on their participation in the bankruptcy process.[17]

Thus, the wellspring of the Ritchie Parties' position for their objection stems from their wish to have their claims, or at least the bulk of them, allowed in the case of PGW alone. If this were done, they would share pro rata in a distribution from the one estate that promises to liquidate its debtor's valuable subsidiary companies down to a very substantial corpus to apportion to creditors.[18] The Ritchie Parties fear the alternate scenario, having their claims allowed against the PCI estates; there, the recovery of any significant value for distribution to creditors is uncertain and litigation-dependent. They also oppose the substantive consolidation of the estate of PGW with that of PCI or any of the other Debtors, which they project to greatly dilute their pro rata share of any distribution.

Thus, the Ritchie Parties make their bid for the appointment of a separate trustee for PGW. They envision such an appointee as virtually mandated to resist substantive consolidation, piercing of the corporate veil, cross-allowance of claims, or any other measure that could lead to the reduction of their in-hand distribution. And they clearly believe that a separate trustee would have to do all things possible to box off the Chapter 7 process for PGW from the rest

---

[16]So go the allegations, anyway. The alleged parlaying of these single-purpose entities and their related transactions, to the detriment of creditors and the investors that were financing the deals, is the core of the prosecution's theory for the federal criminal charges against Tom Petters and his associates.

[17]The Ritchie Parties are said to have a potential loss of $250,000,000 from their dealings with Tom Petters. This, however, is not the largest potential claim in these cases. Tom Petters's downfall carried another group of Chicago-area hedge funds headed by Lancelot Investors Fund, L.P. into Chapter 7. The trustee in the Lancelot cases, who is now active as a prospective claimant in these cases, estimates the total of his estates' claims here to exceed $1.3 billion.

[18]At this time, it appears that PGW's equity interest in the Polaroid Corporation and its related entities is the principal plum. The debtors in that case-grouping have commenced proceedings to bring about a sale of their assets and business operations under 11 U.S.C. § 363.

of these cases.

On the broader plane of Kelley's own disinterestedness, they project a palpable fear of a different outcome, which they insist could result from Kelley's court-appointed status outside of bankruptcy: the chimera is that as receiver Kelley has the duty to aid the government in any seizure of *all* of the value to be garnered from Tom Petters's business enterprise, via forfeiture or ancillary to a restitution process in the criminal case(s), with all that potentially going to those holding the status of "victims" within the meaning of the criminal law, and none going to any party in the status of "creditor" under the bankruptcy laws. They see this ostensible obligation as subordinating the fiduciary duty imposed by a trustee status in Kelley's administration; and this, they say, would leave creditors of the various Debtors unsatisfied on their claims, or undersatisfied as compared to their expectancy through a bankruptcy process.

## B.  The Ritchie Parties' Goals, as to Trustee Appointment

The Ritchie Parties' two distinct fears stream into the two separate thrusts of their legal theory. On the one hand, they propound an "external conflict" on Kelley's part, a circumstance arising outside the structure of these bankruptcy cases. They argue that this conflict would bar him from serving as trustee for *any* of the Debtors. On the other, they allege an "internal conflict," one arising from factors internal to the bankruptcy processes for these Debtors.[19] This one, they say, bars Kelley or any other one person from serving as trustee simultaneously for all of the Debtors. They insist that the bankruptcy estate of PGW must have its own trustee, a person other than the trustee to be appointed for the estates of PCI and the other Debtors.

In their broader attack, the Ritchie Parties would have the Court nullify the appointment of Kelley across the board, leaving it for the U.S. Trustee to appoint at least two other persons as trustees within this grouping of cases. As a fallback, though, they state that "one for

---

[19]The terms "external conflict" and "internal conflict" are the Court's own, coined as shorthand. They are not legal terms of art.

PGW"--i.e., a separate trustee for that Debtor in the person of someone other than Kelley--"would be fine for us," with the U.S. Trustee's appointment of Kelley for the remaining cases to be left intact.[20]

## II. Analysis

### A. The Allegation of an External Conflict: 11 U.S.C. §§ 1104(d) and 101(14)(C)

In the Ritchie Parties' view, Kelley's pre-petition status as a court-appointed receiver for Tom Petters and the whole range of business entities owned or controlled by him, a circumstance pre-dating the bankruptcy filings and persisting in some way since then, prevents him from qualifying as trustee for any of the Debtors.

The Ritchie Parties build out this theory on the requirement of 11 U.S.C. § 1104(d), that any trustee appointed post-petition for these cases be a "disinterested person."[21]  The Bankruptcy Code defines the term "disinterested person," in pertinent part, as ". . . a person that--

. . .

> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason . . .

11 U.S.C. § 101(14)(C).[22]

---

[20]It was not clear from the Ritchie Parties' briefing whether they would acquiesce to such a result. At the end of the first round of oral argument, their counsel acknowledged that they would, using the quoted wording.

[21]11 U.S.C. § 1104(d) governs the process of trustee appointment in a Chapter 11 case, after the court has ordered the U.S. Trustee to appoint one.  In pertinent part, it reads:

> If the court orders the appointment of a trustee, . . . then the United States trustee, after consultation with parties in interest, shall appoint, subject to the court's approval, one disinterested person other than the United States trustee to serve as trustee . . . in the case.

[22]Another portion of this definition bars the status of "disinterested person" to a creditor, an equity security holder, or an insider of the debtor in the bankruptcy case.  11 U.S.C. § 101(14)(A).  In addition, a person who "is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor" may be a "disinterested person," 11 U.S.C. § 101(14)(B), which means that a person who did have that status is not a "disinterested person."  Neither of these exclusions is

The Ritchie Parties insist that Kelley's charge and role under the District Court's receivership orders give him an "interest materially adverse" to a substantial class of parties in interest to these cases. They define those parties as the claimants whose claims would stem from a status of "contractual creditors" of one or more of the Debtors, in particular of PGW--trade creditors that supplied goods or services to enable the maintenance of the Debtors' business operations, and at least some lenders of money to specific Debtors. They distinguish this class of parties from those whom they call "victims." They define the latter as those "investors" who "provid[ed] funds for, and financing to," the Debtors and other entities in the Petters structure, and were induced to do so by fraud on the part of Tom Petters or others.[23]

Per the Ritchie Parties, the material adversity to the former class would arise from the directive to Kelley under Term IV.B.6. of the December 8, 2008 order, to "[c]oordinate with representatives of the United States Attorney's office and Court personnel as needed *to ensure that any assets* [garnered and administered by Kelley as Receiver] *are available for* criminal restitution, forfeiture, or other legal remedies in proceedings commenced by or on behalf of the United States . . ." (emphasis added).

The Ritchie Parties rely entirely on the operative verbs here, "coordinate" and "ensure," coupled with the static notion of receivership assets being "available for criminal restitution, forfeiture, or other legal remedies" that the government may seek from the District Court. From those words, they extrapolate that Kelley is:

---

material to the controversy at bar.

[23]The objection's nomenclature is somewhat confusing, if one thinks about it. Under the criterion that the Ritchie Parties propose for defining "victim" status, the lending of money, a "victim's" claim would have its genesis in contract no less than a trade creditor's would. And since lenders of money would be members of both of the classes that the Ritchie Parties posit, the genesis of the claim in a loan does not, in itself, make a distinction. The thought behind the assumed dichotomy is never made all that clear; perhaps it would have been better-served had the Ritchie Parties identified the class of opposed interests as "victims of PCI." Ultimately, this point is not important; but it does reinforce the impression of a somewhat overwrought tendentiousness to the objection.

1.    ". . . obligated to assist the government with forfeiture . . .";

2.    ". . . charged with seeking redress for the victims of [Tom]
      Petters's fraud . . ."; and

3.    ". . . expressly commanded to make [the] Debtors' assets
      available for, and thus not to oppose, any forfeiture or other
      action by the United States on behalf of victims . . ."[24]

In further shadings and extensions of the same accusation, they insist that:

4.    Kelley's charge is to "maximize the assets of the
      receivership" and "in essence to help the United States build
      its case" for forfeiture;

5.    Kelley's "job" is "to put a context around those assets [i.e.,
      those he would recover on account of the past business
      dealings of PCI and PGW] to bring them into the receivership
      estates";

6.    there is "active assistance in what is going on," as between
      Kelley's performance as receiver and the government as
      prosecutor, and "a cooperative element that is going on . . .";

7.    the United States, in its role as prosecutor, "is the major party
      to the receivership," which "at the end of the day" will "make
      some claim to the assets of the receivership"; and

8.    "a tenor of the [receivership] order . . . clearly requires" Kelley
      "to assist the United States."[25]

Under this characterization of Kelley's duties as receiver, the Ritchie Parties argue

that "real and immediate conflicts [would] arise with respect to Kelley's dual roles as Receiver and

Trustee," giving him "an interest materially adverse" that prevents him from being disinterested as

the statute requires.

There are several reasons why this argument is wrong.

First, it does not recognize the applicable statutory language. Section 101(14)(C)

_____

[24]These are all quotations from the Ritchie Parties' briefing.

[25]These are all direct quotations or very close paraphrasings from the oral argument made by
counsel.

uses the verb "have," a word that denotes possession, in a personal capacity. *See* WEBSTER'S

THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1039 (2002 ed.)

(defining "have" as, *inter alia*, "to hold, keep, or retain especially in one's use, service, regard, or

affection or at one's disposal . . ."). In construing § 101(14)(C), the Third Circuit Court of Appeals

found that Congress's choice of this language was intentional; in the Third Circuit's view, the choice

of verb narrowed the source of disqualification to adverse interests held by a prospective trustee

*personally*, and did not extend to interests to which the trustee had the relationship of

*representative*. *In re BH & P, Inc.*, 949 F.2d 1300, 1310 n.12 and 1311 (3d Cir. 1991).[26] The Third

Circuit's parsing of statutory language and conceptual structure is lengthy and careful. It supports

the rejection of the Ritchie Parties' argument here, at a very basic level: in his status as Receiver,

Kelley does not "have" an interest of *any* sort that is even cognizable under § 101(14)(C), and

hence he is not deprived of the disinterestedness that is required of a trustee for any of the Debtors.

This conclusion is based on somewhat abstract considerations, as to an issue that

is not very developed in the case law. One can envision arguments against it.[27] But even if one

were to recognize Kelley as "having" an interest of some sort via his receivership, the structure of

his past relationship in that capacity with the Debtors now in bankruptcy is simply not the one that

---

[26]The Third Circuit recognized the distinction between the text of § 101(14)(C) and that of 11 U.S.C. § 327(a). The latter bars anyone who "hold[s] *or represent[s]* an interest adverse to the estate" from serving as a professional person for the estate. 949 F.2d at 1310 n.12 (emphasis added to quotation of statutory text). In an unspoken fashion, the Ritchie Parties' theory conflates the sense of these two statutes, which depart from one another based on the verbs used in their text. *BH & P* involved the question of whether one person appointed as trustee for all of the related Chapter 7 cases of a corporation and its two individual principals could be a "disinterested person" within the definition of § 101(14), when there were claims cross-running between the estates. The *BH & P* ruling was expressly directed toward the situation of "multiple debtors served by a single trustee," 949 F.2d at 1310, where the potentially-conflicting "interests" were all subject exclusively to a bankruptcy process. This configuration was different from the one at bar. However, the statutory text is the statutory text; it does not draw a distinction between the two configurations, or give any support to a refinement of the *BH & P* construction; and thus the Third Circuit's analysis should apply to the situation at bar.

[27]For instance, the closing words of § 101(14)(C) broaden the *source* of a materially-adverse interest to "any direct or indirect relationship to, [or] connection with . . . the debtor." That could support a reading of the verb "have" beyond the denotation of ownership or possession in a personal capacity.

the Ritchie Parties impute in such florid fashion.

Under the objection, the implication is that Kelley, under his charge as Receiver from the District Court, is inescapably bound to any future election by the government to seize all of the assets of the whole Petters enterprise through the processes of the criminal cases. As the Ritchie Parties would have it, Kelley is not only beholden, virtually as a cat's paw, to assemble and ready these assets for that end, and that end only; he must also actively assist the government in preparing a case at law for the forfeiture or diversion of the assets through the restitution process.

This simply is not supported by the boundaries drawn by the statute under which Kelley's receivership was created, or by the scope and nature of the authority that Kelley has, as a receiver who is an officer of the District Court.[28]  The statute, quoted *supra* at n.8, contemplates the appointment of a receiver only for the administration of injunctive relief against the further disposition of assets that are implicated in banking law violations.  *Cf. Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-317 (8th Cir. 1993) (listing comparable considerations for appointment of receiver in federal case under diversity jurisdiction).  Its language does not contemplate any advocacy role for the receiver in determining and effectuating a legally-proper, final disposition of such assets.

As to the specific incidents of a receiver's powers and mission, the district court's order is the sole source from which the scope of the authority is to be determined.  *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) ("As an officer of the court, the receiver's powers are coextensive with his order of appointment . . ."); *Resolution Trust Corp. v. Bayside Developers*, 43 F.3d 1230, 1241 n.8 (9th Cir. 1994).  *See also* 13 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 66.03[2] (3d ed. 2007) ("The district court that appoints the receiver establishes the extent of the receiver's authority . . .").  The terms of Judge Montgomery's receivership orders,

---

[28]*See* 13 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 66.03[2] (3d ed. 2007) (receiver is officer of the court presiding over litigation that concerns property entrusted to receiver).

even in the most involved version entered on December 8, 2008, do *not* vest Kelley with any "interest" at all, let alone one that is coeval with those of the United States or aligned with them. The terms do not charge him with protecting or advancing the interests of the United States. They do not obligate him to work in consort with the federal prosecutors in any degree, to advance any strategy on the government's part.

Rather, the directives to Kelley are unadorned. They mandate him to take control of those assets that were immediately accessible to him after the appointment; to recover further liquid value via collection on rights to payment, sale of assets, or management of income streams; to manage all such acquests to preserve their value; and if warranted, to use the bankruptcy process for eligible Petters-related entities to further those basic missions. After that, the only duty imposed on Kelley from the face of the receivership orders, is to "hold in place," to keep the assets secure pending their ultimate disposition via separate court proceedings.[29]

There is nothing more than that to be read into the duty to "coordinate" with the United States Attorney. The verb here is not loaded with any meaning suggestive of a current, joint action toward government seizure. The notion of having the assets in Kelley's hands "available for criminal restitution, forfeiture," and the like signifies a duty to fully disclose their form and whereabouts and to maintain current liquidity, but only that. This reflects the transparency that our legal system makes incumbent on any entrusted officer of a court, in the performance of obligations *to the appointing court*. It reflects no more than that.

This conclusion is reinforced by the fact that the District Court, as an institution, has

---

[29]Per local media reports, Kelley has been making disbursements of various sorts from receivership assets, to pay maintenance-related expenses personal to Tom Petters and his dependents, and toward the cost of his criminal defense. The record at bar has no content that goes to this, but it appears that these expenditures have been made out of assets traceable to Tom Petters in his individual capacity. Per the statements of bankruptcy counsel, Kelley has, with the District Court's authorization, used funds from the receivership over Tom Petters individually, i.e., moneys derived from assets titled in him, to meet the initial administrative expenses for PGW's bankruptcy case. These details are not relevant to the dispute at bar; they are mentioned only to qualify the reference to the Receiver's duty to "hold in place," and to specify that it applies to asset-value net of the operation of the receivership.

no inherent stake in the disposition of the assets in the way that a party would.  It acted in

furtherance of the general public interest in mitigating further losses to innocent parties, and in

maintaining a status quo during the pendency of litigation, in light of accusations of wrongdoing as

large and systemic as those made against Tom Petters.[30]  It acted on motion of the United States

Department of Justice, an agency of the Executive Branch.  But the creation of the receivership

made the receiver's control over its subject matter chargeable to the court, an institution of the

Judicial Branch, with the receiver responsible to the court alone.

On its face, the order fixing Kelley's duties as Receiver did not vest him with any

interest aligned with the United States, nor mandate any action on his part that would make him its

servant, agent, or ally.

That analysis goes to Kelley's past status as Receiver, and to any continuing, active

duty he would have in the status of Receiver, in relation to the Debtors and their assets.  The

question now is whether he would even have such a duty going forward were he to assume the

status of trustee.  The answer to this is not as perfunctory as the U.S. Trustee and the Petters

Committee urge, that Kelley's legally-seated role and status as Receiver "terminated by operation

of law" as soon as the Debtors filed their bankruptcy petitions.  The U.S. Trustee has cited no on-

point authority for that proposition.[31]  Judge Montgomery's order does not expressly terminate the

---

[30]In a footnote-aside in the Ritchie Parties' brief, counsel referred to the District Court's nomination
of Kelley as its agent, "accountable directly to the Court," and then made its prediction of the consequence
of approving Kelley's appointment as trustee:

> Thus, with respect to any given action, Kelly must answer not only to [the
> bankruptcy] court and the creditors, but also to the District Court--a
> circumstance rife with likely conflicts.

As baleful and portentous as this verbiage sounds, it is so vague that it has no place in an argument that is
to be structured under legal principles.

[31]The one case cited, *In re 400 Madison Ave. Ltd. P'ship*, 213 B.R. 888 (Bankr. S.D.N.Y. 1997),
does not stand for the proposition noted.  Its holding, essentially, is that there is no place for the role,
status, or function of a receiver within the bankruptcy case, that "the receiver has absolutely no
responsibility . . . to perform any other duties which are the prerogative and burden of a debtor-in-
possession and a trustee."  213 B.R. at 894-895.

receivership over any of the Debtors upon the filing of a bankruptcy petition.

And, the urged result simply does not fit into the structure of the Bankruptcy Code. The Code contains no provision for the termination of the *status* of a pre-petition receiver upon the filing of a bankruptcy petition that entails the assets subject to the receivership, either automatically or on court order. More to the point, if a receiver's *appointment* were terminated automatically upon bankruptcy, there would be no warrant for the statutory prohibition of a receiver making post-petition disbursement from the property of the debtor, 11 U.S.C. § 543(a), nor a need for the statutory obligations to turn over to the trustee in bankruptcy all property of the debtor, 11 U.S.C. § 543(b)(1), and to file an accounting of such property that, "*at any time*, came into the possession, custody, or control" of the receiver, 11 U.S.C. § 543(b)(2) (emphasis added). Finally, by empowering the bankruptcy court to excuse a receiver from the duty of turnover under § 543(b)(1), but not mandating it to do so, the Code expressly countenances the possibility of a receiver both retaining its legal commission post-bankruptcy, and continuing to exercise it. 11 U.S.C. § 543(d)(1).

However, the individualized legal governance for this Receiver and prospective trustee, as established by the District Court's orders, will achieve something equivalent, once Kelley performs under that governance as he has promised.

With the input of bankruptcy counsel for the Debtors, the District Court clarified in the order of December 8, 2008, that these Chapter 11 cases will go ahead fully governed by the substantive law of bankruptcy. Under the configuration of assets and business operations, that governance necessarily entails the turnover of all property of the Debtors to the control of the steward contemplated by bankruptcy law--in this instance, a trustee in the person of Kelley. Such a turnover has not yet been formally evidenced of record in this case, not the least because the

24

legal posture for such a steward has been anomalous.[32] But to fully harmonize the status, a turnover can now be effected, and hence will be ordered as a condition of approving the appointment.

Through the representations of bankruptcy counsel, Kelley has committed to proceeding with the administration of the estates in these cases in accordance with the values and priorities of bankruptcy law. Kelley acknowledges that this will entail maximizing the value of all assets collected, and then distributing them to the holders of all allowed claims against the Debtors, pursuant to statutory priorities and *pro rata* if necessary, all as the Bankruptcy Code envisions.[33] Addressing the concern most loudly and persistently raised by the Ritchie Parties, Kelley now has committed on the record to resisting any effort by the United States to seize the assets of these Debtors' estates through remedies ancillary to the criminal process, at least until there is a residuum-surplus remaining after satisfaction of all claims through the vehicle of these cases, in accordance with bankruptcy law. And, as the U.S. Trustee points out, the law governing any forfeiture proceeding that might be commenced upon the conviction of PCI or PGW will give Kelley,

---

[32]Judges in at least one district court--for the Southern District of New York--have found no anomaly in equating a person who had been the pre-bankruptcy receiver of a company, appointed as such by a federal court, with a managing officer who would be empowered to carry out the duties of a debtor-in-possession, where the receiver had been court-authorized to file a petition under Chapter 11 for the company and the order of appointment had provided for the subject individual to "be deemed a debtor-in-possession for [the company] in proceedings under Chapter 11 . . ." *In re Bayou Group, L.L.C.*, 363 B.R. 674, 680 (S.D.N.Y. 2007). *See also S.E.C. v. Byers*, ___ F.Supp.2d ___, 2008 WL 5236644 (S.D.N.Y. Dec. 17, 2008). But, per n.3 *supra*, there are colorable arguments to the contrary, based on the Code's text and the legislative history for its 1978 enactment. At oral argument, counsel for the U.S. Trustee advised that the *Bayou Group* ruling had been appealed to the Second Circuit.

[33]The provision in the District Court's December 8, 2008 order for these cases being governed by the Bankruptcy Code would require him to follow through as trustee in that way, regardless; but the layering of his personal recognition makes it a matter of his volition as well as court mandate and automatic operation of statute. Since Kelley's performance will be governed by the Code's regulatory structure for trustees, this takes care of the Ritchie Parties' concern over the District Court's grant of judicial immunity to him. That was there, this is here.

as trustee, a forum to advocate for the bankruptcy estates' interests in the subject property.[34]

Kelley can do no more than state this commitment at this point, and of course he can not guarantee that court-ordered forfeiture or a seizure through restitution will not pluck the assets out of the bankruptcy estates. That will be a matter for Judge Montgomery or another district judge to determine, when and if the government pursues those remedies. But through the statements made by his counsel here, he has committed to advocate for the bankruptcy process in such proceedings, essentially "bankruptcy first, forfeiture or restitution for the balance," i.e., the residual equity value of the components of Tom Petters's enterprise.

So, once Kelley's appointment is approved and he formally effects a turnover, the two predicates for the Ritchie Parties' assertion of an "external conflict" will be vitiated or extinguished. In the abstract, there may still be a gossamer remnant of Kelley's status as Receiver, unless Judge Montgomery formally terminates it over these Debtors.[35]  But the assets of these Debtors will no longer be subject to administration through the receivership; they will be committed to the bankruptcy process, and absent the override of court-ordered forfeiture or a restitution process, their value first will be funneled through bankruptcy to the holders of allowed claims.

In sum, then, Kelley's past status as trustee does not make him not disinterested so as to bar his appointment as trustee for these cases. Any such status he may technically retain after a full effectuation of his appointment as trustee will not do so either. The "external conflict"

---

[34]The conviction of the owner of the assets is a prerequisite for the commencement of criminal-forfeiture proceedings; criminal-forfeiture proceedings result in an *in personam* order against the defendant. *United States v. Vampire Nation*, 451 F.3d 189, 202 (3d Cir. 2006); *United States v. Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007). Once an order of forfeiture is entered, third parties that assert an interest in the defendant's assets may assert them in an ancillary proceeding under 21 U.S.C. §§ 853(k) and 853(n). *United States v. Puig*, 419 F.3d 700, 703 (8th Cir. 2005). The ancillary proceeding is the forum through which third parties may obtain an adjudication of their interests in the property, so that those interests may be protected from the forfeiture of the defendant's interests. *United States v. Totaro*, 345 F.3d 989, 993-994 (8th Cir. 2003). This clearly would give Kelley a forum to assert that only the residual equity interest of Tom Petters or any convicted corporate defendant should be subject to forfeiture, after all allowed creditors' claims had been satisfied through the bankruptcy process.

[35]Such a measure would, of course, be a matter for the District Court alone.

urged by the Ritchie Parties is not a ground for disapproving the United States Trustee's appointment.

### B. The Allegation of an Internal Conflict: FED. R. BANKR. P. 2009

In the alternative, the Ritchie Parties point to circumstances internal to the bankruptcy process for these Debtors: the positioning in a grouping of jointly-administered bankruptcy cases, of a number of closely-tied business entities that apparently engaged in numerous inter-company transfers and transactions pre-petition, and the U.S. Trustee's action in appointing the same person as the trustee for the estates in all of the cases. The Ritchie Parties focus on the appointment of the same person as trustee for the estates of PCI and PGW; they insist that "serving in both roles . . . results in a conflict of interest," and that "[t]he substantial differences between PGW and PCI and the other Debtors lie at the heart of the conflict."

FED. R. BANKR. P. 2009(c) contemplated the United States Trustee making an appointment in the way he did:

> (c)   **Appointment of trustees for estates being jointly administered**
>
> . . .
>
> (2) **Chapter 11 reorganization cases**
>
> If the appointment of a trustee is ordered, the United States trustee may appoint one or more trustees for estates being jointly administered in chapter 11 cases.

In turn, FED. R. BANKR. P. 2009(d) addresses and provides guidance for the dispute at bar:

> (d)   **Potential conflicts of interest**
>
> On a showing that creditors or equity security holders of the different estates will be prejudiced by conflicts of interest of a common trustee who has been elected or appointed, the court shall order the selection of separate trustees for estates being jointly administered.

The Ritchie Parties divine a conflict of interest from the following reasoning:

> PGW is a distinct legal entity with a creditor constituency that is separate and distinct from the creditor constituency of PCI and each of the other Debtors. It appears that, while many of Petters's victims had a contractual relationship with PCI and its subsidiaries, very few of them also had a contractual relationship with PGW. These circumstances produced the different creditor constituencies for PGW and PCI, and those constituencies have diametrically opposed interests given the dramatically different financial circumstances of PGW and PCI.

They prognosticate that PGW's estate, having "substantial operating assets, such as Polaroid and Fingerhut, . . . with potentially considerable value," will likely be in the money, generating a significant distribution to creditors. Their forecast for the PCI-related cases is greatly different: their debtor-entities having "little or no assets of value" pre-petition, their administration in bankruptcy will generate much less in liquidation for distribution to the parties that advanced money to finance the revolving transactions in consumer merchandise that Tom Petters purveyed through PCI's single-purpose corporate subsidiaries. Apparently, those that did such financing toward the end of PCI's operations, without seeing the merchandise-sale transactions close so as to enable repayment of their loans, are to be considered the "victims" of the Ritchie Parties' nomenclature. The Ritchie Parties would distinguish these claimants from the "creditors" of PGW--among which the Ritchie Parties place themselves.

Beyond that, the Ritchie Parties allege that the PGW estate and those of PCI and its Debtor-subsidiaries could find themselves in actual opposition, if the forensic-accounting reconstruction of the Petters enterprise's affairs reveals avoidable transfers between related debtor-entities via the broad-scaled commingling that Tom Petters is alleged to have transacted. Citing the result in *In re BH & P, Inc.*, 949 F.2d at 1313-1314, they argue that the possibility of such faceoffs prevents the appointment of a single trustee here.

In arguing this, the Ritchie Parties assert the status and standing of creditors of PGW alone. The proponents of Kelley's appointment maintain that the situation is not as clear-cut as

that. They point out that PCI, through a wire transfer to its own bank account, received at least one
of the substantial advances that the Ritchie Parties made to Tom Petters's enterprise at his request,
and that this and other evidence could bind the Ritchie Parties into the administration of the estates
of PCI and its debtor-subsidiaries, as creditors there.[36] And, in briefing and at oral argument, the
proponents of Kelley's appointment started quite a fracas over the Ritchie Parties' about-face from
their position in the Illinois state court; there, they had sought the appointment of one person as
receiver for both PCI and PGW, and they got him empowered to do just about anything he chose
with both companies, with little court oversight imposed by the terms of the order of appointment.

      None of the parties who raised these potential blocks specified where they were
relevant to the legal analysis. Perhaps they were intended as a challenge to the Ritchie Parties'
standing to argue this sort of conflict. Perhaps they were just an effort to discredit and delegitimize
the Ritchie Parties' arguments generally, in a connotative sense. One can lay these points to the
side where they belong, however. This prong of the Ritchie Parties' objection should be overruled,
on its merits, under the present posture of these cases.

      First, it should be noted that the issue of disqualification of a trustee from serving as
to all of the estates of related debtors is to "be evaluated prospectively on a case-by-case basis";
and the determination is committed to the bankruptcy court's discretion. *In re BH & P, Inc.*, 949
F.2d at 1313.

      Second, in ascertaining the existence of *disqualifying* conflicts, "horrible imaginings
alone cannot be allowed to carry the day." *Id.* (quoting *In re Martin*, 817 F.2d 175, 183 (1st Cir.
1987); interior quotes omitted). Rather, given the governance of Rule 2009(d), the question is

---

    [36]They also note that two of the counts of the criminal indictment are based on allegedly-
fraudulent transactions by PGW subsidiaries, resulting in PGW being criminally charged under the
umbrella of conspiracy. And this, they say, further erodes the Ritchie Parties' demand that the bankruptcy
process for PGW must be quarantined from the administration of the PCI-related estates, on the alleged
ground that the two major parts of Tom Petters's enterprise were free-standing and fraudulent activity was
purveyed through the PCI structure alone.

29

whether creditors will actually be prejudiced by any conflicts of interest that are inherent in the posturing of jointly-administered estates.[37]

This inquiry is more concrete, and that is entirely appropriate. Rule 2009(c)(2) clearly recognizes the considerations that can support the appointment of a single trustee for related cases: economy; the focusing of expertise; the advantage of building familiarity with complex facts and relationships; efficiency in considering and acting in administration; and greater ease in presenting common disputes to the court. There is also the valid goal of avoiding inconsistent approaches to common problems and the lessening of contradictory outcomes in administrative action. Given the greater probability of pre-petition commingling and the like, as among related debtors, Rule 2009(d) makes no bones about it: joint administration will probably entail some conflicts of interest among the estates, at least in the abstract. The real issue is whether the conflicts bode actual and particularized prejudice--real detriment--to the creditors of one of the debtors, or to a particular creditor-constituency of one of the debtors, as the estates go through administration under the control of a single person, and that administration passes through the procedural and substantive permutations that that one person elects.

To their credit, the proponents of Kelley's appointment do not try to bluster their way around the prospect that such prejudice could emerge. Where two or more jointly-administered estates have cross-running claims, where they have competing claims against particular assets, where related debtors had engaged in inter-company transfers, or where related debtors have cross-pledged assets on debt to third parties, conflicting interests may ripen. It could happen at different stages--for instance, through a proposal for substantive consolidation of estates, where a creditor's expectancy of a particular pro rata distribution from the estate of one could be diluted by a forced sharing with creditors of a related entity. It might not emerge until a proposed

---

[37]The *BH & P* opinion does not mention Rule 2009(d), which was on the books in 1991, with a text nearly identical to today's. But, clearly, the rule speaks directly to the problem at bar.

distribution of the liquidated value of one debtor in tandem with that of others, whether there had been a substantive consolidation or not. It could come from a trustee's decision to invoke or forgo available bankruptcy remedies for one estate against another, or against third parties. At this early stage of the cases at bar, one cannot deny any of these possibilities out of hand.

But on the other hand, the characteristics of these cases and their backdrop cannot be ignored: multiple pending, major criminal prosecutions against key management personnel of the Debtors; the sheer magnitude of the sums of money in question; the present indeterminacy of what happened to build and then fell the edifice of Tom Petters's enterprise; and the large complexities that must be coordinated to responsibly propel bankruptcy procedures forward. These circumstances powerfully support the concentration of attention and effort into one fiduciary steward, at this time and for a while to come. Kelley has gone up an immensely steep learning curve in the last five months; he has had to amass knowledge, and analyze it with his professional persons; he is making use of that to recover assets, via legal proceedings and otherwise.

Given the intensity of his own investment of attention to these cases, there is no argument on the considerations of economy and efficiency to be made against appointing Kelley, and him alone, as trustee.[38]  Appointing anyone else at this time would entail a two-staged duplication of effort, with a second trustee getting up to speed and the two then going forward on parallel tracks. The significant extra transactional expense to bring a second trustee into the process would be massive, particularly if that trustee were to hire a second group of attorneys and financial analysts. The evaluation of respective options, the determination of whether to coordinate or to go off in opposition, and so forth would cause delay in pursuing recovery of assets or prosecuting causes of action. The Ritchie Parties have not even made a squawk about economy

---

[38]It has long been recognized that economy is a proper consideration in the matter of appointing one trustee in jointly-administered cases. *In re Int'l Oil Co.*, 427 F.2d 186, 187 (2d Cir. 1970) (per curiam) (decided under Bankruptcy Act of 1898); *In re Ben Franklin Retail Stores, Inc.*, 214 B.R. 852, 859 (Bankr. N.D. Ill. 1997).

or efficiency supporting or ultimately vindicating the appointment of a second trustee, and there is
no credible way they can.

At this point, the issue of prejudice under the meaning of Rule 2009(d) is readily
answered, and largely by the nature of the large tasks that have only been started. As described
at the hearing, Kelley and his professional persons see their work cut out for an extended period,
most likely a year or more. As described, their plan does not entail any action or process that would
pit the distribution rights of PGW's creditors directly against those of the creditors of any of the other
Debtors, until most or all recoverable assets have been garnered in. The first mission of a trustee
for these cases is to recover as much value as possible in liquid form, from where it reposed in the
Debtors' ownership or from third parties now obligated to account to the bankruptcy estates. After
that, the trustee will have to get the legal status of encumbrances against that value ascertained,
by stipulation or adjudication. The Ritchie Parties have not identified any aspect of these tasks,
administrative in nature or legally-oriented, that would present a trustee with cross-running
allegiances.

After the recovery and assemblage of the estates' due, the next phase of
administration would begin. At that point, a trustee's pursuit of claims cross-running between the
estates, or the potential dilution of a realization via substantive consolidation, could raise the
prospect of disqualifying prejudice. However, the issue could arise only then, and only then would
it get focused.

At that time, there would be several different means to resolve the issue of prejudice-
causing conflicts among the estates. Kelley himself and the Debtors' counsel have pledged to take
action, i.e., to seek appointment of a second trustee or to bring the issue to the court, if they see
conflicts-in-the-abstract ripening to untenable. The Ritchie Parties have not said that they trust the
Trustee to be responsible in this regard, and they have not said that they don't. But in any event
they can renew their motion, after a cash-bearing estate has been assembled and at a time when

investigation has made the alignments clearer and more concrete. They could renew their motion if Kelley forgoes pursuing a particular claim or cause of action, that bodes actual prejudice to their participation in these cases, and he does not respond to their expressed concerns. At such time, they will receive the judicial attention that the situation deserves, when real focus will be possible.

And in any event, any party that fears prejudice to its interests will have due process before the prejudice ripens to actual detriment, for many of the foreseeable administrative acts.[39] Substantive consolidation is a court-granted remedy that requires a substantial record going to multiple factors, *In re Giller*, 962 F.2d 796, 799 (8th Cir. 1992), and as to which the abiding consideration is "fairness to all creditors," *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).[40] Proposals to abandon estate assets, such as pre-petition causes of action, must come before the court by motion in a Chapter 11 case. Loc. R. Bankr. P. (D. Minn.) 6007-1 and 6004-1(e). In a Chapter 11 case, settlements of avoidance actions or rights of action require court approval, obtained only on motion. Loc. R. Bankr. P. (D. Minn.) 9019-1(a) and 6004-1(e). All of these vehicles give an opportunity for objection to any creditor that sees prejudice to its interests from a particular administrative action by a single trustee for multiple estates.

The structure of Rule 2009(d) imposes a burden of proof on the party that asserts disqualifying prejudice--both a burden of production of evidence if the existence of the prejudice is fact-dependent, and a burden of persuasion if the arguments pro and con are in equipoise. The Ritchie Parties have not carried that burden; they have not made a prima facie showing that, at present, their interests, or the interests of the creditors of any particular debtor, are actually prejudiced at present by the existence of conflicts of interest that arise out of the configuration of

---

[39]"The election or appointment of a [single] trustee [in jointly-administered cases] does not alter substantive rights of creditors or change the character of the estate." *In re Ben Franklin Retail Stores, Inc.*, 214 B.R. at 857.

[40]One court has gone so far as to opine that "[s]ubstantive consolidation should be invoked 'sparingly' where any creditor or debtor objects to its use." *In re Reider*, 31 F.3d 1102, 1109 (11th Cir. 1994).

the Debtors' rights against each other, pre- or post-petition. At this time, there is no "internal conflict" that prevents Kelley from serving as trustee for all of the Debtors, pursuant to the U.S. Trustee's appointment. And, because Rules 2009(c)(2) and 2009(d) do not require the determination on prejudice to be made once and for always, any party in interest may seek judicial relief if Kelley and his attorneys do not acknowledge when future developments in his administration create and focus such prejudice. If appropriate, that relief could include a directive for the appointment of a second trustee.

## OUTCOME

The Ritchie Parties' objection must be overruled, and the U.S. Trustee's appointment will be approved, subject to the one condition previously-identified.

## ORDER

On the decision just memorialized,

IT IS HEREBY ORDERED:

1.      The objection of Ritchie Special Credit Investments, Ltd., to the U.S. Trustee's appointment of a trustee for these cases is overruled.

2.      The U.S. Trustee's appointment of Douglas A. Kelley, Esq., as trustee for all of the Debtors in these jointly-administered cases, is approved.

3.      Douglas A. Kelley, Esq., shall, forthwith:

      a.      meet all requirements set by the U.S. Trustee for his appointment of the status of trustee, including the posting of a bond; and

      b.      in his status as Receiver appointed by the United States District Court for the District of Minnesota, execute and file an appropriate document memorializing his turnover of all of the assets of the Debtors' bankruptcy estates to the appointed trustee.

BY THE COURT:

*/e/ Gregory F. Kishel*

GREGORY F. KISHEL
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

In re:

**Jointly Administered under
Case No. 08-45257**

Petters Company, Inc., et al.,

Court File No. 08-45257

Debtors.

Court File Nos.:

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

### ORDER GRANTING EXPEDITED HEARING AND AUTHORIZING TRUSTEE TO ENTER PLEA AGREEMENTS AND CONDUCT TRANSACTIONS OUTSIDE THE ORDINARY COURSE OF BUSINESS

This matter came before the Court on September 24, 2010 on the motion of Douglas A. Kelley, Chapter 11 Trustee of Petters Company, Inc. and Petters Group Worldwide, LLC for an expedited hearing and an order authorizing the Trustee to enter plea agreements to criminal charges in a Superseding Indictment entered June 3, 2009 and authoring the Trustee to use property of the estate outside the ordinary course of business. Appearances were as noted on the record. Based on the arguments of counsel, moving documents and the record made at the hearing, and the Court's findings of fact and conclusions of law, if any, having been recorded in open court following the close of evidence,

IT IS HEREBY ORDERED:



**EXHIBIT**

2

G 08- 364

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *09/24/2010*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

1.     The Motion for expedited hearing is granted

2.     The Trustee is authorized to enter pleas to counts 1, 14 and 15 of the Superseding Indictment entered against Petters Company, Inc.;

3.     The Trustee is authorized to enter pleas to counts 1, 14 and 15 of the Superseding Indictment entered against Petters Group Worldwide, LLC;

4.     The Trustee, on behalf of PCI, PGW, is authorized to execute any agreements or documents and take any action to carry out the terms of the Plea Agreements; and

5.     Notwithstanding Fed. R. Bankr. P. 6004(h), this Order shall take effect immediately upon entry.

Dated:  September 24, 2010

/e/ Gregory F. Kishel

Gregory F. Kishel
United States Bankruptcy Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil No. 08-CV-5348 (ADM/JSM) |
| | ) |
| THOMAS JOSEPH PETTERS, et al.; | ) |
| | ) |
| Defendants. | ) |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    **Jointly Administered under**
                                                            **Case No. 08-45257**

Petters Company, Inc., et al.,                    Court File No. 08-45257

               Debtors.
                                                            Court Files No.'s:

(includes:
Petters Group Worldwide, LLC;                    08-45258 (GFK)
PC Funding, LLC;                                      08-45326 (GFK)
Thousand Lakes, LLC;                                08-45327 (GFK)
SPF Funding, LLC;                                    08-45328 (GFK)
PL Ltd., Inc.;                                          08-45329 (GFK)
Edge One LLC;                                         08-45330 (GFK)
MGC Finance, Inc.;                                   08-45331 (GFK)
PAC Funding, LLC;                                    08-45371 (GFK)
Palm Beach Finance Holdings, Inc.)              08-45392 (GFK)


                                                            Chapter 11 Cases
                                                            Judge Gregory F. Kishel

In re:
                                                            **Jointly Administered Under**
                                                            **Case No. 08-46617**

Polaroid Corporation, et al.,
                                                            08-46617 (GFK)
               Debtors.
                                                            Court Files No.'s:

(includes:
Polaroid Holding Company;                          08-46621 (GFK)
Polaroid Consumer Electronics, LLC;             08-46620 (GFK)

EXHIBIT
3

| | |
|---|---|
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |

Chapter 7 Cases
Judge Gregory F. Kishel

## COORDINATION AGREEMENT
## AMONG
## PLAINTIFF UNITED STATES OF AMERICA,
## THE RECEIVER, CHAPTER 11 TRUSTEE OF PETTERS GROUP WORLDWIDE,
## LLC, CHAPTER 11 TRUSTEE OF PETTERS COMPANY, INC., ET AL., AND
## CHAPTER 7 TRUSTEE OF POLAROID CORPORATION, ET AL. N/K/A PBE
## CORPORATION, ET AL.

WHEREAS, on October 6, 2008, Plaintiff United States of America, in support of a criminal investigation, sought an asset freeze and receivership under the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, for the benefit of the victims of a massive fraud that took place at Petters Group Worldwide, LLC ("PGW") and Petters Company, Inc. ("PCI"), two of the defendants in the receivership civil action;

WHEREAS, for purposes of this agreement, the term "Individual Defendant" or collectively, "Individual Defendants," shall include Thomas Joseph Petters, Deanna Coleman, Robert White, James Wehmhoff, Larry Reynolds dba Nationwide International Resources, Michael Catain dba Enchanted Family Buying Company, and business entities owned or controlled by Thomas Joseph Petters except those entities in pending bankruptcy proceedings jointly administered in Bankruptcy Case Nos. 08-45257 and 08-46617 and all direct and indirect subsidiaries of such entities;

WHEREAS, based upon the conviction of Thomas J. Petters, and the guilty pleas of Individual Defendants, the United States holds the statutory authority to forfeit proceeds of fraud, and assets involved in or traceable to money laundering, including assets held by third parties, in accordance with 18 U.S.C. §§ 981 and 982, and contends that said authority vests in the United States the power to forfeit and seize all or substantially all of the assets of PGW and PCI upon conviction for the crimes now alleged against them, including assets of their subsidiaries, including but not limited to the bankruptcy estates of Polaroid Corporation, et al., n/k/a PBE Corporation, et al., jointly administered under Case No. 08-46617 ("PBE Estates");

2

WHEREAS, for purposes of the civil action commenced by the United States, the Court appointed Douglas A. Kelley as receiver (the "Receiver") on October 6, 2008 over companies directly or indirectly 100% owned or controlled by Thomas Joseph Petters, including PCI and PGW, as well as their respective subsidiaries, and as receiver on October 14, 2008 over the Individual Defendants who have all now either been convicted or have pleaded guilty in federal court of criminal offenses;

WHEREAS, in accordance with his power as the Receiver, on and after October 11, 2008, Kelley caused PCI and subsidiary and affiliated entities, including but not limited to PC Funding, LLC, Thousand Lakes, LLC, SPF Funding, LLC, PL Ltd., Inc., Edge One LLC, MGC Finance, Inc., PAC Funding, LLC, Palm Beach Finance Holdings, Inc. (collectively "PCI Estates") and PGW to file for bankruptcy protection under Chapter 11 ("PGW Estate"), and caused the entities comprising the PBE Estates to file for bankruptcy protection under Chapter 11;

WHEREAS, the Office of the United States Trustee appointed, and thereafter, the United States Bankruptcy Court approved, Kelley to act as Chapter 11 Trustee for the PCI Estates and for the PGW Estate (in such capacity "Trustee"), and upon conversion to Chapter 7, John R. Stoebner to act as Chapter 7 Trustee for the PBE Estates (in such capacity "Stoebner");

WHEREAS, Thomas J. Petters ("Petters") has been convicted and sentenced, and the United States and the Receiver expect Individual Defendants to be sentenced within the next months;

WHEREAS, the United States, Kelley, as the Receiver and Trustee, and Stoebner seek to maximize recovery to victims and creditors and minimize receivership and bankruptcy expenses through the coordination of their respective efforts for the victims and creditors;

WHEREAS, to date, the United States Attorney's Office has sought to forfeit certain assets owned by Individual Defendants, and will seek to return the proceeds of forfeited assets to victims pursuant to Part 9 of Title 28, Code of Federal Regulations;

WHEREAS, there is a significant overlap of identity between victims of the fraud and creditors of the PCI Estates and the PGW Estate, and competing litigation would result in the overall diminishment of the recovery for victims and creditors alike and undue delay in the distribution of assets;

WHEREAS, the United States and Kelley, acting in his capacities as the Receiver and as Trustee, and Stoebner desire to compromise and resolve their respective claims to property subject to the Court's Preliminary Order of Forfeiture and property of the receivership and bankruptcy estates;

WHEREAS, Kelley, as Receiver, requires that this Coordination Agreement be contingent upon judicial approval of the Agreement in the receivership action;

WHEREAS, Kelley, as the Chapter 11 Trustee of the PCI Estates and the PGW Estate, and Stoebner, as the Chapter 7 Trustee of the PBE Estates, require that this Coordination Agreement be contingent upon judicial approval of the Agreement in their respective bankruptcy cases;

THEREFORE, Plaintiff United States, Douglas A. Kelley, as the Receiver and Trustee, and John R. Stoebner, Trustee for the PBE Estates, agree as follows:

I.   RECEIVERSHIP WIND DOWN PLAN FOR INDIVIDUAL DEFENDANTS

    A.   The Receiver and the United States Attorney's Office will jointly identify all unliquidated assets personally owned by each Individual Defendant.

        1.   The Receiver will provide the United States Attorney's Office with a schedule for each defendant of all identified assets personally owned by each Individual Defendant.

        2.   The Receiver will provide the United States Attorney's Office with access to all information, documentation and analysis, including the work performed by PricewaterhouseCoopers ("PWC"), addressing the assets personally owned by the Individual Defendants.

        3.   The government will provide the Receiver/Trustee access to information consistent with its discovery obligations to the extent possible to assist in the recovery of assets for victims and creditors, subject to the interests of ongoing government investigations and the constraints set forth in Federal Rule of Criminal Procedure 6(e) and otherwise.

    B.   Unless the United States Attorney's Office and the Receiver agree otherwise, the parties agree that the assets owned by the Individual Defendants shall be addressed in the following manner:

        1.   Assets Owned Wholly by an Individual Defendant. The parties agree that the United States Attorney's Office will execute on or will forfeit the individual assets personally owned by such defendant and will seek to liquidate those assets for the benefit of the victims through remission of assets.

            a.   Corporate Ownership Interests. The parties agree that the United States Attorney's Office will execute on or will forfeit the corporate ownership interests of such Individual Defendant, other than as provided in Section I.B.1.b., and the United States will seek to liquidate those assets for the benefit of the victims through remission of assets.

            b.   Petters' Ownership Interest in Bankruptcy Entities. As part of this agreement, and in exchange for the consideration set forth herein, the United States agrees not to forfeit or to execute on defendant

4

Petters' direct or indirect ownership interests in the PCI Estates, the PGW Estate, Petters Capital, LLC, Petters Aviation, LLC, or their subsidiaries (including subsidiaries of subsidiaries), to the extent agreed upon in Section II.C.

2.    <u>Assets Subject to Third-Party Claims</u>. The parties agree that the United States Attorney's Office will forfeit assets owned by the Individual Defendants jointly with third parties or those Individual Defendant assets that are subject to third-party claims (such as security interests), or will otherwise execute on the Individual Defendant's interest, and will seek to liquidate those assets for the benefit of the victims.

3.    <u>Assets Transferred to Third Parties</u>.

    a.    <u>Individual Defendant Transfers</u>.   Subject to the following paragraph, unless the United States Attorney's Office and the Receiver agree otherwise, the parties agree that the United States Attorney's Office will use its forfeiture or other authority to recover assets transferred by the Individual Defendants to third parties, and will seek to return the proceeds of the forfeited or recovered assets for the benefit of the victims through remission of assets.

    b.    <u>Charitable Donations</u>. The United States and the Receiver acknowledge that demands previously have been made by the Receiver, and that additional demands will be made, on behalf of Individual Defendants, Thomas J. Petters Family Foundation or other Receiver entities against entities or individuals including certain religious, charitable, educational and/or political institutions for the return of donations and gifts. The parties agree that the return of such funds may be used for the satisfaction of professional fees and expenses incurred by the receivership and for the benefit of the victims, as approved by the Court in which the receivership is pending.

    c.    All funds recovered by the Receiver or Trustee from charitable donations made by the Individual Defendants pursuant to the preceding paragraph shall be transferred to the United States pursuant to paragraph I.B.4. below, after the Receiver's fees and expenses are covered.  All funds recovered by the Receiver from charitable donations made by any other person or entity except the Individual Defendants shall be administered by Kelley as Receiver and/or Trustee, as applicable under paragraph III.B.2., after the Receiver's fees and expenses are covered.

4. <u>Assets Subject to Forfeiture</u>. Upon the entry of a court order directing that assets may be seized or restrained by the United States, directing the forfeiture of assets, or otherwise directing the Receiver to turn over assets, the Receiver shall turn over the assets to the United States as directed in the order. Any unresolved claims to the assets will be addressed in the criminal case pursuant to Fed. R. Crim. P. 32.2, or in the civil forfeiture proceedings. The government will seek to return the proceeds of forfeited assets to victims pursuant to the remission process under the provisions of Title 28, Code of Federal Regulations, Part 9.

5. <u>Subsequently Obtained Assets</u>. If, following the transfer of an Individual Defendant's assets by the Receiver, the Receiver comes into possession of additional assets owned by an Individual Defendant, the Receiver shall transfer funds or transfer property to the United States for liquidation for the benefit of the victims through remission of assets.

C. Based on the pending criminal sentencings and the wind down plan set forth herein, the United States and the Receiver expect that receivership expenses will diminish and will substantially cease following the sentencing of the last Individual Defendant. The United States does not expect to recommend significant receivership fees following the sentencing of the last Individual Defendant; provided that the United States and the Receiver recognize that under this Agreement, the parties may agree the Receiver should take on additional responsibilities if such efforts are in the best interest of the victims in which case additional receivership fees will be incurred and recommended by the United States. The Receiver agrees to use his best efforts to minimize fees and costs incurred by the receivership estate subject to the performance of his duties and the discharge of his responsibilities pursuant to court order, and to use his best efforts to utilize the United States Bankruptcy Court and his position as Trustee to maximize recovery to creditors.

D. In exchange for the consideration set forth herein, and in an effort to maximize coordination and minimize unnecessary cost and undue delay, Kelley, as Trustee of the PCI Estates and of the PGW Estate, and other than as expressly provided in this Agreement, agrees to relinquish claims to the assets covered in Section I of this Agreement and agrees to execute releases as are necessary and appropriate for the recovery and distribution of the foregoing assets pursuant to Section I.

II. <u>CORPORATE CRIMINAL LIABILITY AND FORFEITURE</u>

A. On December 1, 2008, a United States Grand Jury returned an indictment against PCI and PGW for their respective criminal conduct in furthering a $3.7 billion fraud. Those charges remain pending against PCI and PGW.

B. As part of this agreement, and in an effort to avoid undue and wasteful litigation expenses, and in light of the overwhelming evidence already adduced by the government in the trial of Thomas Joseph Petters, Kelley, as Trustee, agrees that

6

PCI and PGW will seek Bankruptcy Court approval to enter guilty pleas pursuant to the plea agreements.

C.  In exchange for the guilty pleas and the other consideration set forth herein, the United States agrees, unless otherwise agreed by Kelley, as the Receiver or as Trustee, and the United States, (i) not to seek forfeiture of assets (tangible or intangible) and (ii) not to otherwise execute on assets (tangible or intangible), owned by the PCI Estates and the PGW Estate, and their respective subsidiaries (including subsidiaries of subsidiaries) including but not limited to actions (and proceeds therefrom) brought (i) for the return of corporate assets, (ii) on behalf of the PCI Estates and the PGW Estate against professionals, and (iii) for the return of false profits or other clawback or avoidance claims, including principal from a purported loan to, or investment in any entity comprising the PCI Estates or the PGW Estate, or any corporate affiliates, provided that such assets are distributed as part of a bankruptcy proceeding overseen by the Office of the United States Trustee and subject to the approval and adjudication of the United States Bankruptcy Court. Except as provided in Section I of this Agreement and unless the trustee of the following respective bankruptcy estates agrees otherwise, the United States further agrees not to seek forfeiture of assets (tangible or intangible) of the PBE Estates, Petters Capital, LLC bankruptcy estate, Petters Aviation, LLC bankruptcy estate, or any of their subsidiaries (including subsidiaries of subsidiaries), including but not limited to actions (and proceeds therefrom) brought (i) for the return of corporate assets, (ii) against professionals, and (iii) for the return of false profits or other clawback or avoidance claims, including principal paid on a purported loan or investment.

III.  BANKRUPTCY ESTATES

A.  Allocation of cost and Intercompany Issues. Kelley, as the Receiver and Trustee, and Stoebner agree that as of July 1, 2010, all expenses incurred for the benefit of the bankruptcy estates, whether such expenses are incurred for the benefit the PCI Estates, PGW Estate or PBE Estates, directly, or for the benefit of any subsidiary (whether or not such subsidiary is itself in bankruptcy), the value of which will inure to the benefit of the bankruptcy estates, will be submitted in the bankruptcy proceedings in accordance with the applicable provisions of the Bankruptcy Code, Federal Bankruptcy Rules and Local Rules, for review, approval and payment.

1.  Kelley, as the Receiver and Trustee, and the United States, acknowledge and agree that while some of the receivership expenses incurred prior to May 1, 2010, particularly those related to professionals, will inure in part to the benefit of the PCI Estates and the PGW Estate, such expenses may be paid from the receivership.

2.  PricewaterhouseCoopers Expenses.  The Receiver retained PWC to provide certain services for the benefit of a number of entities including the PBE Estates. Receiver has requested that he be allowed a Chapter 7 and Chapter 11 administrative expense claim in the PBE Estates

Bankruptcy proceeding with respect to the fees and expenses of PWC that relate to the PBE Estates. Kelley, as the Receiver, and Lindquist & Vennum as Chapter 11 counsel to the PBE Estates and special counsel to the Chapter 7 Trustee of the PBE Estates, have represented that they believe that the PBE Estates have received the benefit of at least $852,620.00 of accounting services and investigation performed by PWC for which the receivership has or will pay PWC for the period December 18, 2008 to June 30, 2010. Stoebner and Receiver stipulate to the allowance of the following administrative expense claims:

a.   For Kelley as the Receiver, in the amount of $298,972.48 as an allowed Chapter 11 Administrative expense claim.

b.   For Kelley as the Receiver, in the amount of $553,647.52 as a Chapter 7 Administrative expense claim. Subject to subparagraph 3(c) below, this claim will be paid by Stoebner upon Bankruptcy Court approval of this Agreement and subject to the availability of funds pursuant to future cash collateral orders in the PBE Estates cases.

The payments and provisions as outlined in this paragraph, are subject to Court approval of this Agreement by both the Bankruptcy Court in the Polaroid Corporation bankruptcy proceeding, BKY No. 08-46617 and the U.S. District Court in Civ. No. 09-CV-5348.

3.   $500,000 Held in Trust Account. The PBE Estates advanced the sum of $500,000 to Kelley as the Receiver on December 18, 2008. The response to Question 10 of the Statement of Financial Affairs in the PBE Corporation Bankruptcy Proceeding 08-46617 states, "Prior to petition, $500,000 payment was made with the approval of the Honorable Ann D. Montgomery, U.S. District Court Judge for the District of Minnesota, as Polaroid Corporation's equitable share of receivership expenses in Civ. No. 09-CV-5348 (ADM/JSM). These funds are presently held in trust by Kelley, Wolter & Scott pending further direction from Judge Montgomery." Stoebner and Kelley as Receiver stipulate that the $500,000 is property of the PBE Estates. Kelley, as the Receiver and Lindquist & Vennum as Chapter 11 and Chapter 7 counsel for the PBE Estates, represent that $407,761.82 of the $500,000 payment was a fair and equitable approximation of the costs and fees incurred by the receivership on behalf of Polaroid Corporation prior to the Polaroid Corporation's Chapter 11 petition having been filed. Upon Court approval Kelley shall be authorized to:

a.   Reimburse the receivership in the amount of $407,761.82 as and for the expenses and fees incurred prior to December 18, 2008 described below:

      i.     PricewaterhouseCoopers in the amount of $5,953.29

      ii.    Lindquist & Vennum in the amount of $258,048.25

      iii.   FTI in the amount of $7,953.00

      iv.   Kelley, Wolter & Scott in the amount of $135,807.28

b.     Apply $32,343.32 in payment towards the Chapter 11 Administrative expense claim described in subparagraph 2a. above.

c.     Apply $59,894.86 in payment towards the Chapter 7 Administrative expense claim described in subparagraph 2b above.

The payments and provisions as outlined in this paragraph, are subject to Court approval of this Agreement by both the Bankruptcy Court in the Polaroid Corporation bankruptcy proceeding, BKY No. 08-46617 and the U.S. District Court in Civ. No. 09-CV-5348.

4.     The receivership has advanced funds to the PCI Estates and the PGW Estate since October 2008, to cover operational expenses of the PCI Estates and the PGW Estate to maximize the estates for the benefit of the victims and creditors. The receivership will waive any claim to the return of such funds as ordinary course loans, or upon any other theory.

5.     Stoebner has demanded that the PGW Estate return shares of PWB Health Limited and Wideblue Limited to the PBE Estate which Stoebner asserts were transferred to PGW in May 2008 for no consideration. Stoebner and the PGW Estate agree to resolve this demand by the PGW Estate assigning any interest in the shares and any other obligations of PWB Health Limited or Wideblue Limited to the PBE Estates.

6.     Pursuant to a Settlement Agreement made and entered into as of January 1, 2008, Polaroid Holding Company and PGW resolved a claim against Lawrence Harmer in exchange for a promissory note in the amount of $5,080,099.80, payable from Harmer to PGW. Stoebner has demanded that the PGW Estate assign its interest in the promissory note to Stoebner, asserting that PGW provided no value for any interest in the note. Stoebner and the PGW Estate agree to resolve this demand by the PGW Estate assigning, to Stoebner upon the request of Stoebner, any interest in the note or proceeds derived therefrom.

B.     Third-Party Litigation.

1.     Kelley, as the Receiver and Trustee, agrees that all fees and expenses arising on and after May 1, 2010, from litigation and claims by the PCI Estates or the PGW Estate, or their subsidiaries (including subsidiaries of subsidiaries), including but not limited to actions brought for the return of corporate assets, actions brought on behalf of the PCI Estates or the PGW

Estate against professionals, current or former employees, and actions for the return of false profits or other clawback or avoidance claims, including principal from a purported loan to, or investment in any entity comprising the PCI Estates or the PGW Estate (or any corporate affiliates), including cases in which parallel claims are brought by Kelley, as the Receiver and Trustee, will be submitted in the bankruptcy proceedings in accordance with the applicable provisions of the Bankruptcy Code, Federal Bankruptcy Rules and Local Rules for review, approval and payment. The United States acknowledges that the receivership expenses incurred prior to May 1, 2010 for the efforts of professionals will inure, in part, to the benefit of the bankruptcy estates and third-party litigation.

2.    If there is a recovery (by settlement or following litigation) based on parallel claims pursued by Kelley, as the Receiver and Trustee, the proceeds of the recovery will inure to the benefit of the bankruptcy estates; unless there is a judgment or recovery based solely on a claim made by the Receiver, in which case, the proceeds will be turned over to the United States for the benefit of victims through remission of assets after the bankruptcy estates have been reimbursed for all fees and expenses paid or incurred in conjunction with the action that resulted in the recovery.

3.    Kelley, as Trustee, agrees to consult and confer with the creditors committee regarding the litigation and claims against third parties for the return of false profits or other clawback or recoverable claims, including principal from their purported loan to or investment in the PCI Estates or the PGW Estate, or their subsidiaries (including subsidiaries of subsidiaries).

4.    In exchange for the consideration set forth herein, and in an effort to maximize coordination and minimize unnecessary cost and undue delay in distributions, unless otherwise agreed by Kelley, as the Receiver or as Trustee, and the United States, the United States Attorney's Office agrees it will not pursue its forfeiture claims against third parties for the return of corporate asset transfers, including but not limited to the false profits or other clawback or avoidance claims, including principal from purported loans or investment in entities comprising the PCI Estates or the PGW Estate. The United States Attorney's Office agrees to execute releases as are necessary and appropriate for the recovery of the foregoing assets.

IV.    MISCELLANEOUS PROVISIONS

A.    This agreement will not become effective, and no party shall have any obligations under this agreement, until such time as the courts overseeing the receivership, the PCI Estates, the PGW Estate and the PBE Estates approve this Coordination Agreement.

10

B.    This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement.  No person or entity which is not a party to this Agreement will have or acquire any rights or remedies under or by reason of this Agreement.

Dated: Aug. 16, 2010

B. TODD JONES
United States Attorney

BY: GREGORY G. BROOKER
Assistant U.S. Attorney

Dated: Aug 16, 2010

DOUGLAS A. KELLEY
Court-Appointed Receiver

Dated: Aug 16, 2010

PETTERS COMPANY, INC., ET AL.

BY: DOUGLAS A. KELLEY
Bankruptcy Trustee

Dated: Aug 16, 2010

PETTERS GROUP WORLDWIDE, LLC

BY: DOUGLAS A. KELLEY
Bankruptcy Trustee

Dated: Aug 16, 2010

PBE CORPORATION, ET AL.

BY: JOHN R. STOEBNER
Bankruptcy Trustee

REVIEWED AND APPROVED:

_____
ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

_____

REVIEWED AND APPROVED:

_____
GREGORY F. KISHEL
UNITED STATES BANKRUPTCY JUDGE

12

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

             Plaintiff,                       Civil No. 08-5348 ADM/JSM

     v.

Thomas Joseph Petters; Petters Company,
Inc., a/k/a PCI; Petters Group Worldwide, LLC;
Deanna Coleman, a/k/a Deanna Munson;
Robert White;
James Wehmhoff;
Larry Reynolds, and/or dba Nationwide International
Resources, aka NIR;
Michael Catain and/or dba Enchanted
Family Buying Company;
Frank E. Vennes, Jr., and/or dba Metro Gem
Finance, Metro Gem, Inc., Grace Offerings
of Florida, LLC, Metro Property Financing,
LLC, 38 E. Robinson, LLC, 55 E. Pine, LLC,
Orlando Rental Pool, LLC, 100 Pine Street
Property, LLC, Orange Street Tower, LLC,
Cornerstone Rental Pool, LLC, 2 South
Orange Avenue, LLC, Hope Commons, LLC,
Metro Gold, Inc.,

             Defendants,

Douglas A. Kelley,

             Receiver,

Gary Hansen,

             Receiver.

---

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

Petters Company, Inc., et al.,

             Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;

**Jointly Administered under**
**Case No. 08-45257**
Court File No. 08-45257 (GFK)

08-45258 (GFK)
08-45326 (GFK)



**EXHIBIT**
4

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *09/14/2010*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc.; | 08-45329 (GFK) |
| Edge One LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Finance Holdings, Inc.) | 08-45392 (GFK) |

Chapter 11 Cases
Judge Gregory F. Kishel

---

In re:

Polaroid Corporation, et al.,

Debtors.

**Jointly Administered under
Case No. 08-46617**
Court Files No. 08-46617 (GFK)

| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC | 08-46629 (GFK) |

Chapter 7 Cases
Judge Gregory F. Kishel

## ORDER APPROVING COORDINATION AGREEMENT

This matter came before the undersigned United States District Judge and United States

Bankruptcy Judge for hearing on the motions (Case No. 08-cv-5348 (ADM/JSM) [Docket No.

1348]; Case No. 08-bk-45257 (GFK) [Docket No. 407]; Case No. 08-bk-46617 (GFK) [Docket

No. 1021]) to approve a Coordination Agreement among the Receiver, Chapter 11 Trustee of

2

Petters Group Worldwide, LLC, Chapter 11 Trustee of Petters Company, Inc., et al., and Chapter 7 Trustee of Polaroid Corporation, et al., n/k/a PBE Corporation, et al. (the "Coordination Agreement"). Appearances were as noted on the record.

Based on the arguments of counsel, moving documents, the record made at the hearing, the Courts' findings of fact and conclusions of law, having been recorded in open court following the close of argument and the Courts having reviewed the Coordination Agreement and being fully advised in the premises,

IT IS HEREBY ORDERED THAT:

1. The Coordination Agreement is hereby approved. Approval of the Coordination Agreement in the bankruptcy cases is subject to the following conditions, which general governing law imposes and which the trustees in the bankruptcy cases acknowledge:

a. Pursuant to Term II.B. of the Coordination Agreement, the trustee of the estates of Debtors Petters Company, Inc. and Petters Group Worldwide, LLC, shall request the Bankruptcy Court's approval of the terms of any plea agreement, and shall seek authorization to enter guilty pleas pursuant to them, via formal motion on appropriate notice.

b. Before exercising their power under Terms I.B.3.a. and II.C. of the Coordination Agreement, to relinquish for forfeiture by the United States, assets (tangible or intangible) of the bankruptcy estates, or rights of avoidance and/or recovery belonging to the bankruptcy estates, the trustees of the estates of all affected debtors shall seek approval and authorization from the Bankruptcy Court, via formal motion on appropriate notice.

2. These Courts shall retain their respective jurisdiction to enforce the terms of the

Settlement Agreement.

Dated: September 14, 2010          _____ s/ Ann D. Montgomery _____
                                        ANN D. MONTGOMERY
                                        UNITED STATES DISTRICT JUDGE

Dated: September 14, 2010          _____ /e/ Gregory F. Kishel _____
                                          GREGORY F. KISHEL
                                        UNITED STATES BANKRUPTCY JUDGE